AMERICAN SHIPPING CO. (GENERAL ELECTRIC X-RAY CORP.) *v.* UNITED STATES (No. 4371)[1]

United States Court of Customs and Patent Appeals, March 23, 1942

*Tompkins & Tompkins* (*J. Stuart Tompkins* and *Allerton deC. Tompkins* of counsel, for appellant.

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks*, special attorney, of counsel), for the United States.

[Oral argument February 4, 1942, by Mr. J. Stuart Tompkins and Mr. Weeks]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

BLAND, Judge, delivered the opinion of the court:

On January 3, 1938, the American Shipping Co., as nominal consignee for the General Electric X-Ray Corporation, entered at the port of Chicago certain X-ray grids which have been shipped to it from Sweden on December 6, 1937. The grids involved in this appeal are of three sizes:

8″ x 10″ (20.5 x 25.5 cm.)
12⅝″ x 13⅝″ (32 x 34 cm.)
14″ x 17″ (35.5 x 43 cm.)

The appraiser appraised the units above listed at 165, 225, and 275 Swedish kroner, respectively, all less 2 per centum discount, packed.

The importer appealed for reappraisement to the United States Customs Court, and Judge Evans, sitting as a single reappraising judge, held with the contentions of the importer and approved the entered value, which is substantially the invoiced value, of 100, 150, and 180 Swedish kroner, respectively.

The Government appealed to a division of said court. In a decision of the First Division, written by Judge Walker, concurred in by Presiding Judge Oliver (Judge Brown dissenting), the appraised value was sustained and the decision of the single judge reversed.

From the judgment of said appellate division of said court, the importer has appealed here.

The involved grids are for use with X-ray fluroscopic apparatus in the examination of the body of a patient and are said to absorb secondary radiation from the patient's body. They are made by a secret process and are claimed to be unlike any .other grids made. They are used by doctors and in hospitals and are rather expensive, although not large, and range in appraised· value from about $41 to $68 each.

The facts are not in material dispute. It is agreed that there was no export value; that one grid was the usual wholesale quantity sold in the home market and for exportation to countries other than the United States. Both parties to this proceeding contend for a foreign value, certain sales being relied upon by the importer as showing the entered value to be the proper foreign value, and certain other sales being relied upon by the Government to show the appraised value as being the proper foreign value.

The record shows the following concerning the number of sales of grids of different sizes and the price at which each article was sold during a period from September 1, 1937, through July 31, 1938:

The 8″ x 10″ (or 20.5 x 25.5 cm.) grids were the subject of eleven different sales, eight to dealers (5 at 100 Kr. each, and 3 at 123.75 Kr. each), and three to consumers at 165 or 164.10 Kr. each.

The 12⅝″ x 13⅝″ (or 32 x 34 cm.) grids were the subject of twelve sales, six to dealers (4 at 150 Kr. each, and 2 at 168.75 Kr. each), and six to consumers at 224.10 or 225 Kr. each.

The 14″ x 17″ (or 35.5 x 43 cm.) grids were the subject of only one sale to a dealer at a price of 180 Kr. each.

The prices of the articles were the same from September 1, 1937, to July 31, 1938, and no question is raised here by either party as to the relevancy of the dates of sales.

The record shows that when sales are made by dealers to consumers the price is the same as the sales price by the manufacturer to consumers direct. It also shows that the manufacturer sells to dealers in quantities of one at a time, and where he sells more than one to a dealer at one time there is no additional discount for quantity.

It is the contention of the importer that the appraiser should have taken as the foreign value the price shown in the sales to the dealers rather than the price shown in the sales to the consumers.

With the exception of a contention made by appellant with reference to the effect to be given to the single sale of the 14″ x 17″ grid, its contentions are in substance that under the circumstances shown in the record, the price of sales to consumers of one grid each, although such sales were in the usual wholesale quantity, may not be accepted as the basis of arriving at the foreign value of the imported merchandise and that only sales made to dealers for resale show the proper foreign value. It is argued at great length by the importer that a sale to a consumer is a retail transaction, notwithstanding the fact

that the sale was of the usual wholesale quantity, and that Congress contemplated only wholesale transactions as being pertinent to the inquiry on the question of foreign value. It is emphasized that " 'all purchasers in the ordinary course of trade' do not refer to users or to sales in single units at retail"; that the term "in the ordinary course of trade" must be given the effect of eliminating so-called retail transactions in determining proper foreign value inasmuch as (quoting from appellant's brief) "sales to users or consumers of single units should be held to be retail sales and not in the ordinary course of trade," and that Congress could only have had in mind when it used said term "in the ordinary course of trade" the ordinary course of trade in wholesale quantities in wholesale transactions.

Appellant urges that the term "trade" found in the phrase "freely offered for sale to all purchasers * * * in the ordinary course of trade" in section 402 (c), Tariff Act of 1930, in effect on the date of the importation of the involved merchandise, "should be construed to refer to freely offered sales prices in the ordinary course of business to persons who deal in the commodity in question for a profit, or who receive the benefit of the trade prices or trade discount."

Section 402 (c), Tariff Act of 1930 (the shipment in question was made prior to July 25, 1938, when said section was amended so as to eliminate the consideration of sales and offers of sale made for export to foreign countries), reads as follows:

SEC. 402. VALUE.

    \*        \*        \*        \*        \*        \*        \*

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The Government supports the decision of the appellate division and cites and relies upon many cases decided by this court, some of, which were relied upon by said appellate division. It urges, in effect that where a single unit is a wholesale quantity, single units sold to consumers fall within the definition of "foreign value" and that numerous decisions of this court have squarely held to this effect. It urges that the record shows that all sales of single units in the instant case were in the ordinary course of trade; that the word "trade" only requires that there be a purchaser and a seller, regardless of whether the merchandise is purchased for the purpose of resale or not. It emphasizes the argument that trade is dealing in merchandise and that the purchaser is engaging in trade when he buys to use as well as when he buys to sell. It urges that the importer seeks to read into section

402 (c), *supra*, language which is not therein contained and which could not be read into it without indulging in legislation rather than construction, and that appellant's proposal constitutes a modification of the subsection which is a matter to be left to Congress for future legislative consideration.

The appellant relies principally for the support of its contentions upon the decision of this court in *Keve & Young* v. *United States*, 11 Ct. Cust. Appls. 94, T. D. 38747, and quotes liberally from said decision.

It is true that under the particular facts stated in that case, which need not be recited here, the court held that sales direct to the consumer were not to be regarded in the determination of foreign value for the reason that the record in that case showed that machines were sold at wholesale, in quantities of more than a single unit, to dealers in countries other than the country of origin, and that a single unit was not "per se a wholesale quantity."

It seems that the appellate division in the instant case has properly distinguished the *Keve & Young* case when it said:

> * * * The *Keve & Young* case is cited for the proposition that sales to users in units of one are not sales in the ordinary course of trade. We do not think that that case stands for that proposition.

> * * * * * * *

> We think a reading of the decision of the Court of Customs Appeals in the *Keve & Young* case indicates that it was predicated upon the *lack* of any sales of a wholesale character, that is to say, the market for the articles in Great Britain was limited only to consumers who purchased in single units, so that no possibility existed for the making of sales "in the usual wholesale quantities." In this way the situation there presented differs from that in the case at bar. Here we have sales made to dealers as well as to consumers, and in both cases the usual quantity sold appears to be a single unit.

In the *Keve & Young* case, *supra*, the court concluded that the record of sales to consumers were not wholesale transactions for the reason that they were not in wholesale quantities in view of other sales in larger quantities shown in the record.

But, regardless of any view that may be taken of the *Keve & Young* case, in which the tariff act of 1913 was involved, we feel certain that the law is well settled by later cases that in the interpretation of the language "is freely offered to all purchasers * * * in the usual wholesale quantities and in the ordinary course of trade," sales to users or consumers, if made in wholesale quantities, may be considered in determining foreign value, and we know of no decision by this court, or any other appellate court to the contrary.

Probably the leading case on this question is *United States* v. *Richard & Co.*, 15 Ct. Cust. Appls. 143, T. D. 42216, which involved the definition of "foreign value" under the Tariff Act of 1922. In that case this court, in an opinion by Presiding Judge Graham, held as follows:

It is argued because sales to wholesalers are all made at the same price that therefore this price thus becomes the wholesale price. But it will be observed that the statute does not thus establish the wholesale price. Section 402 (b) does not provide that the wholesale price shall be the price *to wholesalers*, but the price in the usual *wholesale quantities*. The law is not concerned with the persons who buy, but the manner in which they buy.

This statement was made by a unanimous court in a very carefully considered case upon a record where the only freely offered price shown was the price paid by those who did not receive certain discounts, among whom were consumers. It was there very definitely pointed out that the definition of "foreign value" there involved (same definition in the 1930 act involved here) evidenced an intention of Congress to be concerned with the quantity sold rather than the persons to whom the merchandise was sold.

This case was followed in a number of other decisions by this court. See *United States* v. *H. W. Robinson & Co., et al.*, 19 Ct. Cust. Appls. 274, T. D. 45436. In the last-cited case certain tie squares were sold by the manufacturer to wholesalers only and the wholesalers in turn sold in the usual wholesale quantities, at a higher price, to those who wished to manufacture silk ties. The higher price was accepted as the basis of foreign value, notwithstanding the fact that the sales were made to consumers. It was the conclusion there that the price at which the manufacturer sold to the wholesaler was not a price that was freely offered to all purchasers.

In *United States* v. *Mexican Products Co.*, 28 C. C. P. A. (Customs) 80, C. A. D. 129, relied upon by the court below, it was held that:

In determining foreign and export values, as defined in section 402 (c) and (d), respectively, it is proper to consider only the market values or prices at which merchandise like or similar to that imported is freely offered for sale *to all purchasers* (not to the greater number, or to those of a particular class) in the principal markets of the country from which exported in the usual wholesale quantities and in the ordinary course of trade. See *United States* v. *A. W. Faber, Inc.*, 21 C. C. P. A. (Customs) 290, T. D. 46819; *Stone & Downer Co.* v. *United States*, 21 C. C. P. A. (Customs) 479, T. D. 46958; *United States* v. *American Glanzstoff Corp.* 24 C. C. P. A. (Customs) 35, T. D. 48308.

In the latter case, referring to the definition of "foreign value" in section 402 (c) *supra*, we said:

The expression "all purchasers" does not mean the members of some association only, or 99 per centum of the purchasers of such goods, or those who would not thereafter buy such goods from someone else, but it does mean all of those who cared to buy such goods in such markets.

A number of other cases to the same effect might be referred to. See *Kennedy* v. *United States*, 19 C. C. P. A. (Customs) 24, T. D. 44869; *Jenkins Bros.* v. *United States*, 25 C. C. P. A. (Customs) 90, T. D. 49093; and *Adolph Goldmark & Sons Corp.* v. *United States*, 22 C. C. P. A. (Customs) 358, T. D. 47378.

On this phase of the case it seems to us that the importer is making a contention which might well be directed to Congress. In fact, it is

plain from the legislative history referred to in the briefs of the parties that its attention has been frequently called to situations involving the contentions of appellant. Notwithstanding the fact that the whole situation had been considered by the committees of Congress responsible for the enactment of tariff acts at a time when the uniform decisions of the courts were contrary to appellant's contention, language identical to that used in the Tariff Act of 1922 was thereafter reenacted in the Tariff Act of 1930, and the Tariff Act of 1930 was subsequently amended by the Customs Administrative Act of 1938 in respects hereinbefore stated—all of this being done without making any effort to change the language of the provision in respects with which we are here concerned. These facts seem to us to be significant.

Appellant seeks to have us read into the provision language which it does not contain and language which would amount to more than a construction of the provision and would be court legislation. The importer would have us interpret the paragraph as if it read:

freely offered for sale to all purchasers in the principal market of the country from which exported in the usual wholesale quantities to wholesalers who sell to retailers in the ordinary course of trade.

If Congress had thought it was advisable not to emphasize "wholesale quantities" and to provide that the sales which should be taken as a basis of the value for appraisement purposes should be only those in which wholesale quantities were sold for resale, it would have been an easy matter for it to have done what appellant seeks to have us do.

In the instant case, the only freely offered prices to all purchasers, obviously, were the prices at which the merchandise was appraised. To read language into the provision in accordance with appellant's implied request is to read out of the same provision the phrase "freely offered for sale to all purchasers" which has been so strongly emphasized in the decisions of this court. Congress unquestionably did not want to base foreign value upon sales which were not made in wholesale quantities, but it did intend that the price to be accepted as a basis of foreign value should be that which was freely offered to all and not that which was offered to a privileged few regardless of the status of the few.

We see nothing in the context of the various provisions in different tariff acts enacted during the last hundred years, relating to "actual market value, or wholesale price" or any other value, to which our attention has been called by the importer, that indicates in the slightest degree that in the Tariff Act of 1922 or in subsequent tariff enactments it intended to confine the transactions relied upon as a basis for foreign value to those between the manufacturer and those who purchased for resale. On the contrary, it seems to us that the language, which was new in said section 402 (b), Tariff Act of 1922, and reenacted in section 402 (c), Tariff Act of 1930, suggests the opposite intention.

Appellant emphasizes the fact that the record shows more sales to dealers than to users of the instant merchandise, but this is beside the point on the issue at bar, although important in determining the usual wholesale quantity. Such sales to dealers were not made at prices freely offered to all purchasers, whereas the prices for the merchandise in wholesale quantities to consumers were the prices at which all purchasers could have obtained the goods.

On this phase of the case, but one other argument presented by counsel seems to require consideration. We quote from appellant's brief:

Further, it seems to us not unreasonable to hold that the major portion of sales of a given commodity is the criterion which establishes, *not merely* what is the usual wholesale quantity in which that article is sold, but also what is the *ordinary course of trade* in dealing in it. [citing authorities]

So, in the present case, the appellant contends that sales by the manufacturer to dealers in quantities of one *or more* of the X-ray grids in question, to be resold to the ultimate consumers, show what the statute requires, namely, the ordinary course of trade.

It is difficult to understand how it can be contended, under the instant record, that the sales made to consumers were not in the ordinary course of trade. The ordinary course of trade shown by this record is to sell to both wholesalers and consumers and the fact that one kind of sales exceeds the others in number is of no importance. The sales in the instant case made to consumers were not isolated or restricted or exceptional in their character. It was the ordinary practice of this manufacturer, who was the sole manufacturer of this kind of goods, to sell both to wholesalers for retail and to consumers for consumption. We find no merit in this contention of appellant.

Appellant has made a contention directed against the holding of the lower court that appellant had not proved *prima facie* that the sale of the 14″ x 17″ grid at the price of 180 kroner each established the proper foreign value of this article. As to this particular size of grid, appellant's proof shows but one sale to a dealer at the price of 180 kroner each. The manufacturer's affidavit contains the following:

From September, 1937 through July, 1938, I made no sales of the type 35.5 x 43 cm. [14 x 17 inch] to ultimate consumers, but I made one sale of this type to a dealer as follows:

| Date of Sale | Purchaser | Quantity | Unit Price |
|---|---|---|---|
| July 25, 1938 | A. B. Elema, Stockholm, Sweden | 1 | 180. |

The Treasury attaché reported in exhibit 7, which was introduced into the record:

*Prices.*

No price list is published. The following were said to be the effective inland prices for hospitals and supply houses:

| Size | Hospitals | Supply Houses |
|---|---|---|
| * * * * * * * | | |
| 35 x 43 cm | Skr. 275.00 | Skr. 180.00 |

The appellate division, on this issue, held as follows:

It will be noted that the 275 Skr. price to hospitals reported by the Treasury attaché is not stated to be based upon any sale or offer to sell. However, in view of the known course of business of the manufacturer to sell his grids to consumers at higher prices than those charged to dealers we think it was incumbent upon plaintiff, as part of its *prima facie* case, to establish the price at which the 14- x 17-inch grid was offered to consumers, or, in the alternative, to establish that it was not offered to consumers. Section 402 (c), *supra*, refers to the "price * * * at which such or similar merchandise is freely offered for sale to all purchasers * * *," and the mere fact that there were no sales to consumers would not indicate that there had been no offers for sale. We therefore are of the opinion that plaintiff has failed to meet the burden placed upon it, and the appraised value must be presumed to be the value of the merchandise (sec. 501, Tariff Act of 1930).

We are in agreement with the appellate division that the mere proof of the one sale of this size grid to a dealer, under the circumstances at bar, does not show that it was a "freely offered" sale. The circumstances surrounding the sale are not shown so as to warrant the conclusion that it should be accepted as proof overcoming the presumptive correctness of the appraiser's appraisement.

We are in agreement with the holding of the appellate division that the appraised value of the instant merchandise was its proper dutiable value, and its judgment to that effect is *affirmed*.