50 CCPA

**BIDDLE SAWYER CORP., Appellant,**

v.

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5120.**

United States Court of Customs and Patent Appeals.

June 20, 1963.

John D. Rode, New York City (Ellsworth F. Qualey, New York City, of counsel), for appellant.

John W. Douglas, Acting Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Mollie Strum, Trial Atty., Customs Section Dept. of Justice, New York City, for the United States.

MARTIN, Judge.

This is an appeal from the judgment of the United States Customs Court, First Division, C.D. 2310, overruling the importer's protest against the classification of polyvinyl pyrrolidone, commonly referred to as PVP, as a nitrogenous compound of vinyl alcohol under paragraph 2 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739.

Appellant claims that the imported PVP is properly dutiable as a medicinal preparation under paragraph 5 of the Tariff Act of 1930, as modified by T.D. 52739. It bases that claim on two grounds: (1) that such PVP had previously been so classified under an established and uniform practice of classifica-

tion which practice could not be changed without the notice required by statute and regulations; and (2) that the imported PVP is, in fact, a medicinal preparation as that term is used in paragraph 5, as modified.

The pertinent statutes and regulations are as follows:

Paragraph 2, as modified:

" * * * allyl alcohol, crotonyl alcohol, vinyl alcohol, * * *

* * * * * *

ethers, esters, salts and nitrogenous compounds of any of the foregoing, whether polymerized or unpolymerized; * * *

* * * * * *

all the foregoing not specially provided for * * * .......... 3¢ per lb. and 15% ad val."

Paragraph 5, as modified:

"All chemical elements, all chemical salts, and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for * * * .......
12½% ad val."

Section 315(d) of the Tariff Act of 1930, as modified by the Customs Simplification Act of 1953; T.D. 53318:

"(d) No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling; but this provision shall

not apply with respect to the imposition of antidumping duties."

Section 16.10(a), Customs Regulations of 1943, as amended by T.D. 53093 and T.D. 53399:

"16.10 *Change in classification or value; higher or lower rate; effective date.*—(a) If there is an established and uniform practice at the various ports, a change in classification resulting in a higher rate of duty, except as the result of a court decision, shall be made only upon the Bureau's instructions and shall be applicable only to merchandise entered for consumption after the expiration of 90 days after the date of the publication of the Bureau's instructions in the Treasury Decisions. In the case of merchandise entered for warehouse, such change shall apply to goods withdrawn for consumption after the expiration of such 90-day period, provided the warehouse entry is unliquidated or can be reliquidated within 60 days after the date of liquidation."

The first witness for appellant was Mr. Haim, a vice president of the corporation. He testified that the imported PVP was purchased as pharmaceutical grade PVP suitable for tabletting, i. e. as a binder [1] for the active medicament in making tablets and sold as pharmaceutical grade PVP, and described "pharmaceutical grade" as defining a standard of purity required for use by the pharmaceutical industry in the production of pharmaceuticals. He further testified that the PVP was first imported in 1956, at which time an inquiry by telephone at the Customs House resulted in information that PVP of pharmaceutical grade was classifiable under paragraph 5 as a medicinal preparation. He also stated, when the initial shipments arrived, appellant received certain notices from the appraiser, appellant's collective exhibit 1, that the rate of the imported

1. The record indicates that the terms "binding agent" and "granulating agent" have been used in an equivalent sense, and that PVP in functioning as a binding agent acts as a granulating agent.

PVP would be 12½ per centum under paragraph 5, but that, in August of 1957, appellant received additional notices, appellant's collective exhibit 2, that the rate would be advanced to that specified in paragraph 2.[2] On receipt of the latter notices, according to Haim's testimony, he again telephoned the collector's office and was again informed that pharmaceutical grade PVP was dutiable under paragraph 5. Thereupon, appellant sent a letter[3] to the collector asking the rate of duty for technical and pharmaceutical grade PVP, and received a reply[4] stating that PVP of pharmaceutical grade is dutiable under paragraph 5.

Appellant's second witness, Dr. Joseph L. Kanig, an associate Professor of Pharmacy at Columbia University and a consultant to pharmaceutical manufacturers, testified that there are three grades of PVP. He identified these as (1) technical or commercial grade, (2) pharmaceutical grade, and (3) a more purified form, which is used in plasma, or blood extending work. He stated that PVP of pharmaceutical grade must meet specified standards of purity which make it acceptable for use in dosage forms in the pharmaceutical industry and that the principal uses of pharmaceutical PVP is in the production of tablets. Dr. Kanig testified that PVP has the unique property of being soluble in water and organic solvents, with the result that it can be used in making tablets where either water or an organic liquid such as alcohol is used as the solvent. He further testified that, in certain instances, PVP will provide a more predictable rate of release of the medicament in the tablet than the other more commonly used binding agents. Dr. Kanig pointed out that one could use the technical grade of PVP for the uses of the pharmaceutical grade of PVP, except that when so used "You would not then get the advantage of the predictability of the performance of the material." Dr. Kanig further testified

that there is also the question involved of the components of the technical grade which are not PVP and that "There might be so-called impurities of a chemical nature present."

Another witness called by appellant, Percy O. Cunningham, the customs examiner who examined and advisorily classified the imported PVP, testified that from 1953 to 1956 his advisory classification of PVP was in accordance with a letter[5] of July 26, 1951, by the Chief of the Division of Classification. The customs examiner testified that "The reason for reporting under different rates and paragraphs was based on advice from the chemist, based on samples of actual importations, including these we're discussing, and the United States Customs Laboratory report, setting forth certain facts." He further stated that, in 1957, he received from the General Services Administration (G.S.A.) in New York City certain constants or specifications for PVP and that it was his "general impression that it [the specifications, or tests] was to establish tests for the blood plasma extender grade." He testified that thereafter all PVP which was tested by the laboratory was tested in accordance with those "specifications of constants, chemical constants and standards" for blood plasma extender and that it was his belief that any PVP imported, which did not meet these specifications was returned or advisorily classified under paragraph 2. He further testified that from 1953 to the time when he had the G.S.A. specifications in 1957, importations of PVP were classified primarily on the laboratory report of the United States Customs Chemist, together with all other available information. He testified that, if the imported PVP was designated "pharmaceutical grade," he did not necessarily classify it under paragraph 5 because he had found that analysis in the laboratory often showed the invoice description not to be correct.

2. Both the notices received in August 1957 and the earlier notices informed appellant that "Final determination will be made on liquidation."

3. Appellant's exhibit 3.

4. Appellant's exhibit 4.

5. Appellant's exhibit 5.

He stated that his advisory classifications, to his knowledge, were adopted by the collector at New York and that the practices with respect to classification and advisory classification are disseminated to other ports than New York. He also said that the practice which prevailed at New York with respect to PVP was followed at all of the other ports in the United States.

We are faced with two issues here, one being whether the imported PVP is a medicinal preparation. Concerning this question the Customs Court in its opinion stated:

> "There is nothing in the testimony herein to indicate that the pharmaceutical grade PVP, in the instant case, was the medicant involved in giving the assembled or completed tablet its potential therapeutic effect. On the other hand, the conclusion is unescapable that the real materials of therapeutic value were contained in ingredients other than the PVP and that the use of the latter, at most, was as a carrier to control the point of release of the therapeutic ingredients in the tablets and, further, to control the rate of their release. Under the facts in this case, the PVP was not really shown to be a medicinal preparation."

Appellant contends that the imported PVP is a medicinal preparation. Appellant urges that the language of paragraph 34 of the Tariff Act of 1930 indicates that a substance may be a medicinal preparation without necessarily having therapeutic properties. Appellant further contends that, in performing the function of binding a tablet, carrying it to the proper place in the body and releasing the medicant in the optimum fashion, the imported material is unquestionably of use "in curing or alleviating, or palliating or preventing, some disease or affection of the human frame."

Appellee, on the other hand, urges that the record is bare of evidence that the imported PVP has any therapeutic or medicinal properties. Appellee argues that the PVP referred to in appellant's exhibit 5, i. e., the letter dated July 26, 1951 from the Chief of Division of Classification, shows that the PVP referred to as a pharmaceutical grade must have therapeutic properties as a blood extender and that the record reveals that the imported PVP is not of that type.

The other issue before us is whether notice under section 315(d) of the Tariff Act of 1930, as modified, and section 16.10(a) of the Customs Regulations of 1943, as amended, was necessary before classification of the imported PVP under paragraph 2. The Customs Court regarded the evidence insufficient to warrant sustaining appellant's contention that such notice was necessary.

Appellant urges that its exhibit 5 (the letter of July 26, 1951) is a ruling on tariff classification which the writer, the Chief of the Division of Classification, Entry, and Value of the Bureau of Customs, was authorized to make as the delegate of the Secretary of the Treasury, and that pursuant "to this ruling * * * *all* pharmaceutical grade PVP imported from 1951 until sometime in 1957 was classified as a medicinal preparation." Appellant argues that the action of the Collector of Customs at New York in liquidating entries of pharmaceutical grade PVP at the higher rate under paragraph 2 of the Tariff Act without notice published in the Weekly Treasury Decisions is an administrative action which is illegal and contrary to the provisions of section 16.10(a) of the Customs Regulations.

Appellee, on the other hand, argues that the appellant has not met the burden of proof to uphold its contention that at the time of the importations of the PVP there was an established and uniform practice of classifying merchandise of the grade of the imported PVP under paragraph 5 as a medicinal preparation. Appellee points out that all of the merchandise herein was imported between December 18, 1956 and March 5, 1958. All of it was classified under paragraph 2 of the Tariff Act of 1930, as a nitro-

genous compound of vinyl alcohol. Appellant's collective exhibits 1 and 2, appellee argues, are mere notices of a contemplated action with respect to the classification and are all dated during the year 1957. Thus it is urged that the exhibits cannot establish a practice prior to 1956. Appellee also takes the position that, since each of the exhibits contemplates a different classification of the same merchandise, they do not prove an established uniform practice. Appellee contends that appellant's exhibit 3, a letter by the importer to the collector asking for the rate for technical and pharmaceutical grade PVP, did not inform the Customs Bureau that PVP of the grade imported in the instant case could *not* be used as a blood plasma extender. Appellee urges that it is clear from exhibit 5 that the pharmaceutical grade of PVP to be classified under paragraph 5 is that grade used as a blood plasma extender and that the Deputy Collector of the Liquidating Division, in referring to pharmaceutical grade PVP in his letter to the importer (appellant's exhibit 4), was referring to PVP that is to be used as a blood plasma extender. Appellee contends that the non-existence of any established and uniform practice of classifying PVP like that imported is further underscored by the customs examiner's testimony that any imported PVP that was described in an invoice as "pharmaceutical grade" was not necessarily classified as a pharmaceutical grade.

Before discussing the principal issues involved in this controversy we should come to some conclusion as to what the word "pharmaceutical" signifies in determining these issues since it is used in various ways through the record. Three of appellant's witnesses testified that there were three grades of PVP, i. e. technical, pharmaceutical, and that used as a blood plasma extender. Another of appellant's witness, Cunningham, testified:

"Q. Now, you said previously that you were familiar only with the pharmaceutical grade, and the technical grade? A. That's right.

"Q. Now, during the period, say for '53 to the time when you had these G.S.A. specifications in '57, were there importations of technical grade, and pharmaceutical grade PVP? A. Yes.

"Q. Now, how did you advisorily classify them? A. I classified them based primarily on the laboratory report of the United States Customs Chemist, together with all other available information.

"Q. But, if it was a pharmaceutical grade, didn't you classify it under Paragraph 5? A. Not necessarily.

"Q. Why not necessarily? A. Because, in my experience, I have found that, with the importation of drugs, particularly pharmaceutical chemicals, an invoice description would very often not be correct. When the shipment was imported, and we examined it physically, and analyzed it in the official laboratory, we found it to be different from the description on the invoice.

"Judge Wilson: Mr. Cunningham, what you're being asked, in effect, is this: After all your investigations, laboratory tests, accumulation of facts, if you found it to be pharmaceutical, how would you classify it?

"The Witness: Medicinal preparation, Paragraph 5.

"Q. Now, after the G.S.A. specifications were used by the laboratory, was only the blood plasma extender classified as a medicinal preparation? A. I believe that's a fair statement.

\* \* \* \* \* \*

"XQ. Mr. Cunningham, you've been an examiner for how long? A. Since 1935; and, in the drug line, officially, since 1938.

"XQ. Now, is there any provision for pharmaceuticals as such? A. No, sir, not in the Tariff Act.

"XQ. There is a provision, however, for medicinals? A. Medicinal preparations, in Paragraph 5.

"XQ. Now, all pharmaceuticals are not classifiable as medicinal preparations, are they? A. No, they are not.

"XQ. Well, is it merely because this was labeled pharmaceutical grade that you put it in as medicinal? A. No, sir.

"XQ. What were the other reasons? I am talking about prior to 1957? A. Principally, from the laboratory reports on actual samples of importations, and the information furnished, sometimes by the manufacturer, sometimes by the importer or his customers, and the authoritative literature available.

"XQ. Did the statements on the invoice or entry have any affect on your decisions? A. Only in a minor way.

"XQ. So that you did not return all merchandise, even all polyvinyl pyrrolidone labeled pharmaceutical grade, as a medicinal, merely because it was labeled pharmaceutical? A. That's right.

"XQ. Now, there was introduced in evidence a photostatic copy of what is termed a Bureau ruling, dated July 26, 1951. Are you familiar with that? A. I have an official copy of the letter, which I understand corresponds to the photostat now before the Court as an exhibit.

"XQ. Referring to the second paragraph of that letter, I want to read the first sentence: "Field reports received in the Bureau disclose that there has not been a uniform practice of classifying polyvinyl pyrrolidone, and various sources have been contacted in connection with your inquiry." Was it, at that time, your information, also, that there was not uniform practice in classifying all polyvinyl pyrrolidone? A. Yes. Prior to that time.

"XQ. Some was classified as a medicinal? A. That's correct; under Paragraph 5.

"XQ. That would be as a chemical compound? A. Or also under Paragraph 5 as a chemical compound not specially provided for.

The letter of July 26, 1951 used the word in this fashion:

"Since the provision for medicinal preparations in paragraph 5 is a provision by use, the Bureau is of the opinion that polyvinyl pyrrolidone of *pharmaceutical grades* is properly classifiable thereunder at the rate of 12½ percent ad valorem. Polyvinyl pyrrolidone of non-pharmaceutical grades is classifiable as nitrogenous compounds of vinyl alcohol polymerized, under paragraph 2, Tariff Act of 1930, as modified, with duty at the rate of 3 cents per pound and 15 percent ad valorem." [Emphasis ours.]

On the other hand, there is no question but that in using "pharmaceutical" the letter is referring to blood plasma extender grades only, since it reads:

"Field reports received in the Bureau disclose that there has not been a uniform practice of classifying polyvinyl pyrrolidone, and various sources have been contacted in connection with your inquiry. In substance, these reports disclose that polyvinyl pyrrolidone has been imported in three forms: (a) bottles of a 3½ percent Kollidone K-30 pharmaceutical grade, (b) a 20 percent solution of the same product, and (c) the same product in powder form. Product (a) contained salts to establish isotonicity with blood, but products (b) and (c) did not. The therapeutic properties of the polyvinyl pyrrolidone were the same in all three products, and each product was of the requisite range of molecular weights for direct administration. It has been used for therapeutic purposes as a blood plasma extender or substitute, and other

therapeutic possibilties are being explored. Research in the uses of polyvinyl pyrrolidone in the industrial fields is also being conducted.

"Polyvinyl pyrrolidone is a nitrogenous compound of vinyl alcohol polymerized and therefore within the purview of paragraph 2, Tariff Act of 1930. It is also provided for with equal specificity in paragraph 5 of the tariff act as a medicinal preparation."

It can readily be seen that the word "pharmaceutical" can be of no help in resolving the questions here presented even though it is used to designate the grade of the imported PVP.

The first principal issue which we will discuss is the question of whether there was an established and uniform practice of classifying merchandise similar to the imported PVP under paragraph 5 which would require notice to be published under section 315(d) of the Tariff Act of 1930, as amended, and section 16.10(a), Customs Regulations of 1943, as amended, if any change in classification was contemplated.

It should be remembered that since the period of importation of the merchandise dates from December 1956 to March 1958, the only period significant in determining whether an established and uniform practice existed would be that period prior to December 1956. Starting with the letter of July 26, 1951, we find that this letter is without value in this discussion because it does not even refer to PVP being used as a binding or complexing agent, the only uses indicated for the imported merchandise. This letter is only concerned with PVP for use as a blood plasma extender.

Also, in this connection we refer to appellant's witness Cunningham's testimony which we have heretofore quoted, as establishing the fact that these importations were never uniformly classified under paragraph 5.

Furthermore, appellant's various other exhibits do not support its position. Exhibits 1 and 2 pertain to the importations themselves and, if anything, they support Cunningham's testimony that the classification varies with each shipment and is dependent upon the laboratory tests of the merchandise involved rather than upon an "established and uniform practice."

Exhibits 3 and 4 not only do not relate to the period prior to the date of importation but it is obvious that in the letter from the Deputy Collector, he was referring only to PVP for use as a blood plasma extender.

We find nothing in the testimony or in the exhibits which supports appellant's contention that there was an established and uniform practice of classifying merchandise of the quality of the imported PVP under paragraph 5. Therefore it was not necessary that a notice be published pursuant to sections 315(d) or 16.10(a).

We come now to the question of whether the imported merchandise should be classified under paragraph 5 regardless of whether there had been an established and uniform practice of doing so. It is our belief that in order for imported compounds to be classified as medicinal preparations "under paragraph 5" they must possess, in and of themselves, therapeutic [6] properties used in the treatment and cure of bodily disorders. This court has quoted definitions of "medicine" and "medicinal" which were acceptable to it in United States v. Wm. Cooper & Nephews, Inc., 22 CCPA

---

6. The term "therapeutic" is defined in Webster's Third New International Dictionary and Funk & Wagnalls' New Standard Dictionary, respectively, as follows:
"therapeutic * * * : of or relating to the treatment of disease or disorders by remedial agents or methods: CURATIVE, MEDICINAL * * *
* * * * *
therapeutic, * * * 1. Having healing qualities; curative; alleviative. * * * "

31, 35, T.D. 47038. There this court said:

"The terms 'medicine', 'medicinal', * * * are defined in Webster's New International Dictionary and Funk & Wagnalls' New Standard Dictionary, respectively, as follows:

"Medicine, *n.* 1. The science and art dealing with the prevention, cure, or alleviation of disease; in a narrower sense, that part of the science and art of restoring and preserving health which is the province of the physician as distinguished from the surgeon and obstetrician. 2. Any substance or preparation used in treating disease; a medicament; a remedial agent; a remedy; physic.

"Medicine, *v. t.* To give medicine to; to affect, effect, bring, or restore as a medicine does.

"Medicinal, *a.* 1. Curative or alleviative; used for the cure or alleviation of bodily disorders; as, medicinal tinctures, plants, or springs. 2. Of or pertaining to medicine; medical.

\* \* \* \* \* \*

"Medicine, *n.* 1. A substance possessing or reputed to possess curative or remedial properties. Medicines may be either solid or liquid, and are broadly classed as internal or external medicines, from their method of use, and simple or compound medicines, according as they contain one or many ingredients. Plants and minerals are the source of most medicines, some of which are active poisons when taken in larger doses.

"Medicinal, *a.* 1. Of or pertaining to medicine; adapted to heal or mitigate bodily diseases; as *medicinal* springs.

"Medicinal, *n.* Any medicine or medicinal substance."

Three cases decided by this court, wherein at least one of the competing paragraphs was different from the ones involved in the case at bar, all indicate that "medicinal" includes only those substances which possess therapeutic properties. United States v. Wm. Cooper & Nephews, Inc., supra; Van Gelder-Fanto Corp. v. United States, 41 CCPA 90, C.A.D. 534; E. F. Drew & Co. v. United States, 41 CCPA 101, C.A.D. 536.

 With this background in mind we now come to the ultimate question as to whether the imported merchandise itself comes within this definition of "medicinal." We think not. The PVP involved here was admittedly imported primarily to be used as a binder in the production of tablets.[7] Although it can also be used as a complexing agent, even when so used, it has no therapeutic property of its own. It is a substance which can be used for various purposes *with* other substances that *do* have therapeutic properties.

Dr. Kanig, appellant's witness, testified as follows:

"XQ. Now, have you had any dealings with the medicinal grade PVP? A. By medicinal, do you mean pharmaceutical?

"XQ. No. I mean medicinal. A. I've never known it to be called that.

"XQ. Didn't you start your testimony by saying there are three different grades? A. Yes; technical, pharmaceutical, and a grade which is used for blood plasma substitutes.

"XQ. Wouldn't you call that medicinal? A. Well, the one that's used for blood plasma substitute I guess you could, but I've never heard it used that way.

"XQ. Now, there's nothing medicinal about the pharmaceutical grade, is there? A. I'm afraid you have to define what you mean by medicinal.

7. It should be noted that the testimony established the fact that the grade of PVP is established at the time of production and cannot be changed thereafter.

"XQ. Therapeutic; curing. A. There, again, we have to make a distinction between the ingredient which has a physiological effect, and the other ingredients or components of that dosage form, which either enhance or activate.

"XQ. Did you ever hear of, or do you know of PVP, the pharmaceutical grade, being prescribed as a medicine for preventing or curing of any disease? A. By itself?

"XQ. By itself. A. Only where it's used as a blood plasma substitute.

"XQ. Only where it's used as a blood plasma substitute. And the pharmaceutical grade cannot be used as a blood plasma substitute, can it? A. No.

Even in using the imported merchandise as a complexing agent, it does not possess therapeutic property nor have any curative effect of its own. Concerning this matter, Dr. Kanig testified

"XQ. Well, in your Isodine,[8] isn't that [PVP] used as a carrier there, to carry the iodine? A. Not totally, no.

"XQ. What is its other purpose? A. Well, it does give properties to iodine which it normally doesn't have, so that it's not a carrier.

"XQ. Such as what? Such as the fact that it now permits the release of iodine on the site of deposition in a less corrosive state, and it does release it over an extended period of time so that you would not get that sort of action from tincture of iodine, for example, as you would from a PVP complex with iodine.

"XQ. That's right, but all it does is carry the iodine to the proper place, and release it at the proper time; isn't that right? A. I wouldn't say so, no.

The most that Dr. Kanig could say for the compound's activity in this situation was that it had some effect on the iodine which is the substance that has the therapeutic properties.

We are satisfied insofar as this record is concerned that the imported merchandise, PVP, does not have curative or alleviative properties in and of itself.

Appellant argues that since the first proviso of paragraph 34 of the Tariff Act of 1930 states " * * * the term 'drug' wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes:" "medicinal preparations" as used in paragraph 5 may be a substance having no therapeutic properties. Appellant goes on to say in its brief:

"The use of the words "therapeutic" and "medicinal" in this fashion must indicate that Congress understood the word "medicinal" to mean something other than therapeutic. When Congress used the words "medicinal preparation" in Paragraph 5 therefore it could not have meant only those preparations having therapeutic value in and of themselves."

Even though in paragraph 34 both "medicinal" and "therapeutic" are used to describe the properties that the substances must possess to be considered a "drug" for tariff purposes, this fact does not warrant our depriving the term "medicinal" of the meaning that lexicographers have established as its common meaning and the case law has established as its meaning for tariff purposes.

Since appellant has not proved the correctness of its own position nor the error of the collector's classification, we must affirm the judgment of the Customs Court.

Affirmed.

RICH, J., concurs in result only.

8. The record indicates that Isodine is a commonly known complex which is a combination of PVP and iodine.