## KEVE & YOUNG *v.* UNITED STATES (No. 2062).[1]

CONSTRUCTION, PARAGRAPH R, SECTION III, TARIFF ACT OF 1913—"ACTUAL MARKET VALUE OR WHOLESALE PRICE."

Paragraph R, section III, tariff act of 1913, directing that appraisements shall be the "actual market value or wholesale price," and defining such value or price, contemplates, not two market values, but one only. Where goods were sold in the country of exportation at retail only, and invoiced to this country at the cost of production plus 10 per cent profit, their appraisal at the retail price in the country of exportation was upon a wrong theory of the law and void.

### United States Court of Customs Appeals, June 2, 1921.

APPEAL from Board of United States General Appraisers G. A. 8361 (T. D. 38466).

[Reversed.]

*Barnes, Chilvers & Halstead* (*Frank M. Halstead* of counsel) for appellants.
*Bert Hanson,* Assistant Attorney General (*John J. Mulvaney,* special attorney, of counsel), for the United States.

[Oral argument May 6, 1921, by Mr. Halstead and Mr. Mulvaney and Mr. Hanson.]

Before SMITH, BARBER, and MARTIN, Judges; DE VRIES, Judge, participating in the decision by agreement of counsel.

SMITH, Judge, delivered the opinion of the court:

This appeal raises the question as to the validity of the reappraisement of a letter press copier and spare parts imported at the port of New York.

Letter press copiers and spare parts, such as the merchandise imported, are made by Roneo (Ltd.), of London, England, a manufacturing concern, the business policy of which is to retain absolute control in Great Britain of the distribution of its output and to eliminate completely the intervention of wholesale and retail dealers.

To carry out that policy Roneo (Ltd.), long prior to any shipments of any of its products to the United States—and it is claimed as far

---

[1] T. D. 38747.

back as 1890—established 16 branch houses and, having divided Great Britain into 17 sales districts for sales to ultimate consumers, assigned one district to each branch and the remaining district to the main office in London.

By selling directly to the consumer Roneo (Ltd.) secures for itself on sales in Great Britain a net profit of about 35 per cent which includes the manufacturer's profit and the profit which would otherwise go to wholesalers and retailers. No sales of any kind are made to the branch houses and although machines are invoiced to them at the list price to consumers less 50 per cent, that is done solely for the purpose of determining the business and profit made by each branch, and to permit of the award of prizes to the employees of the branch which makes the best annual showing. Indeed that such invoicing of copiers and supplies is not a sales transaction is fully confirmed by the fact that the parent house continued to invoice its manufactures to the branches at the old list price, notwithstanding an advance thereon after the war of 25 per cent.

All bills for merchandise whether sold by the branches or otherwise are sent by Roneo (Ltd.), London, directly to the purchaser and all checks, drafts, and remittances in payment thereof are made to the home office. Moneys needed by the branches for the conduct of their business and the payment of salaries are remitted monthly to each branch by the main office. The officials and employees of the several branches have no financial interest whatever therein other than their salaries and commissions on sales paid by the parent house. As the branches are in no sense independent concerns, it is apparent that they are neither wholesale nor retail dealers as those terms are commonly understood.

All sales in Great Britain whether made by the parent house or its branches are made at the list price directly to the consumer in single units *for use* and no sales in wholesale quantities or otherwise are ever made in the reserved territory to dealers or for resale.

Machines are sold wholesale and in quantities of more than a single unit to dealers in Ireland and for export to other countries and that they are so sold definitely establishes not only that a single unit is not per se a wholesale quantity, but that the sales of single units to the ultimate consumer in Great Britain for use and not for resale, are not wholesale transactions. The business done in Ireland is only 1 per cent of the total business done in Great Britain and Ireland, and it is admitted by the Government that London is the principal market for Roneo letter press copiers.

In countries other than Great Britain and Ireland distribution of the copiers, spare parts, and supplies is effected through independent concerns which have the exclusive privilege of buying Roneo (Ltd.) manufactures in wholesale quantities and of selling the same in their

particular territory in such quantities and under such conditions as to them may seem best.

The Roneo Co. of New York, incorporated under the laws of this country, is the only business house in the United States which has the right to buy and sell Roneo products, and it buys and sells for its own account and benefit exclusively, uncontrolled by Roneo (Ltd.) of London, which has no financial interest in the New York company other than that accruing to it by reason of the ownership of 25 per cent of the corporate stock.

The goods in issue were invoiced to the Roneo Co. of New York at the cost of production, plus 10 per cent profit, and on appeal the general appraiser advanced the entered value to the list price to the consumer in Great Britain, the country of exportation. From the appraisement of the general appraiser an appeal was taken to a board of three general appraisers, which held that the uniform price at which copiers and supplies were sold to the ultimate consumer in Great Britain must be accepted as the foreign market value, and therefore affirmed the values as found by the general appraiser, General Appraiser Brown, dissenting.

On the basis of the values ascertained by the general appraiser and approved by a majority of the board of three general appraisers, the collector liquidated the duties and against his assessment the importers protested on the ground that it was made on an invalid and void appraisement. The Board of General Appraisers, sitting as a classification board, overruled the protest and from that decision the pending appeal was taken.

On the facts as stated the sole question to be decided is whether the price at which goods are sold to the ultimate consumer for use and not for resale is the actual market value of the goods as that term is used and defined in the customs administrative act.

The decision of the Board of General Appraisers, sitting in appraisement, necessarily implies that the law contemplates two market values, one, the price at which merchandise is freely offered for sale to all purchasers, and the other the price which the seller, shipper, or owner would have received and was willing to receive for such merchandise when delivered in the ordinary course of trade in the usual wholesale quantities. The board's decision recognizes that wholesale prices, if any there be, *determine actual market value* in the principal markets of the country of exportation, but holds that if there be no wholesale market then the price at which the merchandise is freely offered for sale to all purchasers becomes the market value. But why there should be two standards or why the wholesale price should take precedence of the price at which the merchandise is freely offered for sale or how one price should be given the preference over the other without legislative authority, is not apparent.

The Government does not go quite so far as the board, but does insist that the price at which the merchandise is bought and sold freely in the markets of exportation is the market value for customs purposes, and that wholesale transactions, if any there be, are the means and nothing more for determining that price. Of course, wholesale prices fix the value of goods in the wholesale market, but just how such wholesale price could be the standard of value for the retail market is not clear. And if wholesale prices be the means *prescribed by statute* for ascertaining the price at which merchandise is freely bought and sold in the markets of exportation, just how any other means can be substituted for it when there are no wholesale transactions is not apparent or indeed discussed. Moreover, to say that wholesale prices are the means of determining the prices at which goods are freely bought and sold in the markets of exportation, is not so far from saying that the wholesale price is the standard of value, the actual market value.

But however that may be, Congress has defined actual market value with such precision and repeated the definition so often in the tariff act now in effect as to leave but little ground for debate as to the legislative intent.

Paragraphs D, I, and K of section III provide as follows:

PAR. D. That all such invoices * * * shall have indorsed thereon, when so produced, a declaration * * * setting forth that the invoice is in all respects correct and true * * *; that it contains, if the merchandise * * * was * * * obtained in any other manner than by purchase, or agreement of purchase, the actual market value or wholesale price thereof, at the time of exportation to the United States, in the principal markets of the country from whence exported: *that such actual market value is the price at which the merchandise described in the invoice is freely offered for sale to all purchasers in said markets, and that it is the price which the manufacturer or owner making the declaration would have received, and was willing to receive, for such merchandise sold in the ordinary course of trade in the usual wholesale quantities.* (Italics are ours.)

PAR. I. That the owner, consignee, or agent of any imported merchandise may, at the time when he shall make entry of such merchandise, * * * make such addition in the entry to or such deduction from the cost or value given in the invoice * * * as in his opinion may raise or lower the same to the *actual market value or wholesale price of such merchandise* at the time of exportation to the United States, in the principal markets of the country from which the same has been imported; * * * and the collector * * * shall cause the *actual market value or wholesale price* of such merchandise to be appraised. (Italics are ours.)

PAR. K. That it shall be the duty of the appraiser * * * by all reasonable ways and means * * * to ascertain, estimate, and appraise (any invoice or affidavit thereto or statement of cost, or of cost of production to the contrary notwithstanding) *the actual market value and wholesale price of the merchandise* at the time of exportation to the United States, in the principal markets of the country whence the same has been imported. (Italics are ours.)

And then after all that iteration and reiteration, which left but little to the imagination as to the standard of value for customs

purposes, Congress in paragraph R elaborately defined the value upon which duties were to be assessed in the following language:

PAR. R. That whenever imported merchandise is subject to an ad valorem rate of duty, or to a duty based upon or regulated in any manner by the value thereof, the duty shall be assessed upon the actual market value or wholesale price thereof, at the time of exportation to the United States, in the principal markets of the country from whence exported; that such *actual market value* shall be held to be the price at which such merchandise is freely offered for sale to all purchasers in said markets, in the *usual wholesale quantities*, and the price which the seller, shipper, or owner would have received, and was willing to receive, for such merchandise when *sold in the ordinary course of trade* in the usual wholesale quantities. (Italics are ours.)

That definition in express terms defines *actual market value*, not wholesale price, and does not contemplate two market values; and the United States Supreme Court so held in United States *v.* Passavant (169 U. S., 16, at p. 22).

The market value of merchandise upon which duties are to be assessed must be expressed in a definite amount of dollars and cents, and to determine that amount recourse must be had either to export prices, wholesale prices, or retail prices. As export prices may well differ from wholesale prices, and wholesale prices do differ from retail prices, it is evident that one or the other of such prices had to be selected as the measure of value. The business interests of the country and protection of the revenues alike required that a minimum of fluctuation and a maximum of ease in ascertainment, both for importers and for customs officials charged with the duty of appraising merchandise, should be the deciding factors in making a choice.

Congress knew just as did the business world that either because of slack demand or exemption from domestic taxes export goods were not infrequently sold for less than the price they commanded in the retail market, and that therefore values could not be safely measured by export prices. It knew that retail prices were not readily ascertainable because of the multitude of retail markets and of the difference in retail prices caused by local conditions. It knew that wholesale prices in the foreign market had a decided advantage over both export prices and retail prices, over the former in that they were steadier and a fairer index of true market value and over the latter, inasmuch as they were more uniform and more readily ascertainable.

And, knowing all that, Congress in paragraph R defined actual market value to be the price at which merchandise was offered not to all purchasers, but to all purchasers *in the usual* wholesale quantities and the price which the seller, shipper, or owner would have received and was willing to receive for his merchandise *when sold in the ordinary course of trade in the usual wholesale quantities.*

Customs experience had shown, and Congress was fully informed, that certain kinds of goods were not sold in the country of export in wholesale quantities. Accordingly, it was prescribed in paragraph

L that that class of merchandise should be appraised at not less than the cost of production when the actual market value thereof, *as defined by law*, could not be ascertained to the satisfaction of appraising officers. As an additional precaution it was further provided by paragraph L that merchandise, which was not actually sold or freely offered for sale *in usual wholesale quantities in the open market of the* country of exportation and which was consigned for sale in the United States or sold for exportation to the United States, should not be appraised at less than the wholesale price at which such or similar imported merchandise is actually sold or freely offered for sale *in usual wholesale quantities* in the United States.

Copiers and supplies which are the subject of this appeal were not appraised at the price at which such merchandise was freely offered for sale to all purchasers in the principal market of the country of exportation in the usual wholesale quantities, or at the price which the seller, shipper, or owner would have received and was willing to receive for such merchandise when sold in the ordinary course of trade in the usual wholesale quantities in such markets, but at the price for which the merchandise was sold in single units to the consumer. The merchandise was therefore not appraised at the actual market value as defined in paragraph R or as prescribed by paragraph L, and the appraisement was therefore void and invalid.

The decision of the Board of General Appraisers is *reversed*.