**LONZA, INC., Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 94–1335.

United States Court of Appeals, Federal Circuit.

Jan. 31, 1995.

Jack D. Mlawski, Galvin & Mlawski, New York City, argued, for plaintiff-appellant. With him on the brief was John J. Galvin.

Bruce N. Stratvert, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued, for defendant-appellee. With him on the brief were Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director and Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office. Also on the brief was Jacob D. Diamond, Office of Asst. Chief Counsel, Intern. Trade Litigation, U.S. Customs Service, of counsel.

Before PLAGER, Circuit Judge, COWEN, Senior Circuit Judge, and RADER, Circuit Judge.

PER CURIAM.

Lonza, Inc. (Lonza) appeals the decision of the United States Court of International Trade in *Lonza, Inc. v. United States,* 849 F.Supp. 51 (Ct.Int'l Trade 1994). The court upheld the decision of the United States Customs Service (Customs) classifying imports of ADC–6, an organic chemical compound that is used as an intermediate in the production of the antibiotic Imipenem. Customs had classified the compound as "Oxygen-function Amino-compounds—Other" under subheading 2922.50.50 of the Harmonized Tariff Schedule of the United States (HTSUS). Imports classified under this subheading are dutiable at the rate of 7.9% *ad valorem.* Lonza agrees that ADC–6 is described under this subheading of HTSUS but argues that the compound should be classified under HTSUS subheading 2941.90.50 entitled "Antibiotics–Other", dutiable at the lower rate of 3.7% *ad valorem.*

■ It is well established that the meaning of a tariff term is a question of law reviewable *de novo* by this court, while the determination of whether a particular article fits within that meaning is a question of fact, reviewable for clear error. *See Simod Am. Corp. v. United States,* 872 F.2d 1572, 1576, 7 Fed.Cir. (T) 82, 86 (1989). We have applied that standard in our consideration of the record, including the briefs and arguments of counsel, and conclude that the Court of International Trade correctly held that the chemical compound in issue was properly classified by the Customs Service. Lonza has not shown that the court's findings of fact are clearly erroneous. We adopt the opinion of the Court of International Trade for the reasons stated in its opinion, a copy of which is attached as an Appendix.

APPENDIX

Slip Op. 94–50

UNITED STATES COURT
OF INTERNATIONAL
TRADE

BEFORE: RICHARD W.
GOLDBERG, JUDGE

LONZA, INC.,

Plaintiff,

v.

UNITED STATES,

Defendant.

Court No. 90–03–00143

[Judgment for defendant.]

Dated: March 25, 1994

Galvin & Mlawski (Jack D. Mlawski, John J. Galvin), for plaintiff.

Frank W. Hunger, Assistant Attorney General; Joseph I. Liebman, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Bruce N. Stratvert), for defendant.

*OPINION*

GOLDBERG, Judge:

This matter is before the court following trial *de novo*. Plaintiff, Lonza, Inc. ("Lonza"), challenges the decision of the United States Customs Service ("Customs") to classify imports of ADC–6,[1] an acyclic organic compound, as other oxygen-function amino-compounds under subheading 2922.50.50 of the Harmonized Tariff Schedule of the United States ("HTS").[2] Lonza argues that although ADC–6 is described by this subheading, ADC–6 is more properly classified under subheading 2941.90.50, HTS, as other antibiotics.[3] Lonza notes that if its merchandise is

classifiable under two competing headings within this chapter, the heading that is last in numerical order prevails. HTS, Section VI, Chapter 29, Note 3. The government urges that ADC–6 is not susceptible to dual classification, and that therefore Customs' classification should be affirmed.

Lonza's claim for classification of ADC–6 under subheading 2941.90.50 is predicated upon application of a broad definition of the tariff term "drugs" that has developed over the past seventy years. This definition finds most recent expression in the predecessor to the HTS, the Tariff Schedules of the United States ("TSUS"). The issues before the court, then, are: (1) whether and to what extent this definition has survived enactment of the HTS; (2) if it does remain applicable, whether this definition impacts the classification of antibiotics under the HTS; and (3) if it does apply to the classification of antibiotics under the HTS, whether ADC–6 meets this definition. Because the court finds that the TSUS definition of "drugs" does not apply to the classification of antibiotics under the HTS, Customs' classification of ADC–6 is affirmed.

*BACKGROUND*

The subject merchandise was entered into the United States at JFK International Airport on April 2, 1989. Customs liquidated the entry on July 21, 1989, and Lonza filed its protest on September 27, 1989. Customs denied this protest on March 16, 1990, and Lonza commenced this action contesting that denial on March 22, 1990. All liquidated duties have been paid. The court exercises its jurisdiction pursuant to 28 U.S.C. § 1581(a).

The following evidence was presented at trial. ADC–6 is used by Merck & Company, Inc. ("Merck") in the domestic production of Imipenem, a member of the beta-lactam family of antibiotics. The term "beta-lactam an-

---

1. The subject imported merchandise consists of (2S, 3R)–(+)–2–(1S)–Hydroxyethyl–3–Amino–1, 5–Pentane–Dioic Acid–5–Methylester, also known as ADC–6.

2. Oxygen-function amino-compounds that are classified under subheading 2922.50.50, HTS

(1989), are dutiable at the rate of 7.9% *ad valorem*.

3. Antibiotics that are classified under subheading 2941.90.50, HTS (1989), are dutiable at the rate of 3.7% *ad valorem*.

tibiotics" is a general descriptor of a family of related analogs which includes, *inter alia,* penicillins, cephalosporins, carbapenems, penems, and monobactams. Lactams are defined as organic chemical compounds formed by the intra-molecular dehydrative cyclization of a carboxylic acid and an amine. In the case of ADC–6, the amino and carboxylic acid termini are joined by the elimination of one molecule of water, to form a four-membered lactam ring. Beta-lactams are four-membered ring lactams which are so named because the amino group involved in forming the cycle is located on a carbon atom "beta" to the carboxylic acid. All currently marketed beta-lactam antibiotics contain the four-membered beta-lactam ring.

Scientific research indicates that the beta-lactam ring is responsible for the ability of beta-lactam antibiotics to kill bacteria. As a result, the beta-lactam ring is also referred to as the killing site. Beta-lactam antibiotics bind themselves to the cell walls of bacteria, operating to inhibit cell-wall synthesis and thus killing the bacteria. While five- and six-membered lactams are quite stable, four-membered ring beta-lactams are susceptible to opening of the ring by hydrolysis. When the four-membered beta-lactam ring is broken by hydrolyzing the amide bond, the ability of all beta-lactam antibiotics to kill bacteria is destroyed.

*Imipenem* is a member of the carbapenem class of antibiotics, and is heterocyclic in chemical structure. Originally, Imipenem was derived from thienamycin. In commercial production, however, Imipenem is synthesized from ADC–6; thienamycin does not exist at any point in this synthesis. In contrast to thienamycin, which is produced naturally by microorganisms, ADC–6 is produced synthetically.

Imipenem also contains a hydroxyethyl side-chain, in addition to its four-membered ring. The purpose of this side-chain is two-fold. First, the side-chain contains a recognition element that enables the antibiotic to identify target bacteria. Second, the side-chain protects the antibiotic from beta-lactameses. Target bacteria defend against an antibiotic by producing enzymes, called beta-lactameses; these enzymes are capable of hydrolyzing the amide bond, thereby cleaving the four-membered beta-lactam ring and thus rendering the antibiotic ineffective. Imipenem's side-chain protects against hydrolysis by these bacterial enzymes.

Merck uses Imipenem in the production of PRIMAXIN®, a potent broad spectrum antibacterial agent intended for intravenous administration. Imipenem itself cannot be administered to patients because it is destroyed by the body's enzymes, and because it exhibits kidney toxicity. As a result, PRIMAXIN® is formulated from a combination of three elements: the antibiotic Imipenem; an inhibitor to protect the antibiotic against destruction by enzymes; and a buffer to protect against kidney toxicity. Imipenem by itself has never been approved for use as a medicine.

Synthesis of Imipenem is a multi-step process during which ADC–6 undergoes various chemical reactions. The structural elements of Imipenem that are contributed by ADC–6 include the four-membered beta-lactam ring as well as the hydroxyethyl side-chain. In fact, ADC–6 contributes every atom used to form each of these components. Imipenem thus retains the ADC–6 "moiety" or major portion of the ADC–6 molecule. Removal of the ADC–6 moiety from Imipenem would yield a simple unsaturated carboxylic acid; this acid would lack a beta-lactam ring and would be devoid of the ability to kill or inhibit the growth of bacteria. As a result, Lonza concludes that ADC–6 imparts therapeutic properties to the antibiotic Imipenem. Lonza also argues that ADC–6, a chemical intermediate used in the production of Imipenem, is properly considered an ingredient used in the production of a medicine.

### DISCUSSION

Prior to enactment of the HTS, imported chemical compounds that: (1) possessed therapeutic properties; and, (2) were chiefly used as ingredients in medicines, merited classification as drugs. Lonza argues that this definition continues to apply under Chapter 29 of the HTS. Before addressing this issue, the court will first examine the

evolution of the definition of the tariff term "drugs."

### A. Historical Evolution of the Tariff Term "Drugs"

The Customs Simplification Act of 1954 directed the Tariff Commission to compile a revision of customs laws classifying imports for tariff purposes. The Commission submitted the *Tariff Classification Study* to Congress and the President on November 15, 1960; a supplemental report was submitted in January, 1962. The Commission's report, as amended, became the Tariff Classification Act of 1962. This act implemented the TSUS, which took effect on August 31, 1963.[4]

The Explanatory Notes to Schedule 4, Part 1 of the *Tariff Classification Study* state:

Paragraph 28(a) provides, among other products, for certain products "suitable for medicinal use" and for "medicinals". In the proposed schedules, the former are provided for in items 407.02 through 407.12; and the latter are provided for under the term "drugs" in items 407.20 through 407.90. The term "drugs" is defined in part 3, headnote 2, and its use in part 1 in lieu of the term "medicinals" is for uniformity of concept which would also provide clarification. Although some question was raised at the hearings in connection with this change of terminology, it is believed that no significant change in coverage or rate is involved.[5]

Thus, the drafters of the Tariff Classification Act of 1962 recognized a distinction between drugs and medicinal preparations. The explanatory notes to the Commission's study further state:

Headnotes 2 through 5, inclusive, define the terms "pesticides", "plastics materials", "plasticizers", and "drugs", *in the light of prevailing customs practice as well as usage in the industry.*

*Tariff Classification Study*, Schedule 4, Part 1, at 21 (emphasis added). As enacted, Schedule 4, Part 1, subpart C, Headnote 5, TSUS (1963), contained the following definition:

The term *"drugs"* in this subpart means those substances having therapeutic or me-

---

4. A definition of the tariff term "drugs" can be traced even further, to paragraph 34 of the Tariff Act of 1922. *United States v. Wm. Cooper & Nephews, Inc.*, 22 CCPA 31, 36, T.D. 47038, 1934 WL 2146 (1934) (citing Tariff Commission, *Summary of Tariff Information* 91 (1921)). This definition was retained in paragraph 34 of the Tariff Act of 1930, which stated that "the term 'drug' wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes...." *Id.* at 35 (emphasis omitted).

In *Synthetic Patents Co. v. United States*, 11 Cust.Ct. 98, 104, C.D. 803 (1943), the court offered the following distinction: "drugs" were substances useful for medicinal purposes, while "medicinal preparations" were products possessing therapeutic properties that were in ready condition for medicinal use. *Id.*

The Customs Court revisited the distinction between drugs and medicinal preparations under the Tariff Act of 1930 in *Synthetic Patents Co. v. United States*, 12 Cust.Ct. 148, 152, C.D. 845 (1944). The court held that a substance possessing therapeutic properties, which were enhanced upon conversion into a medicinal preparation, was properly classified as a drug. Because the subject merchandise required a chemical change to achieve practical medicinal value, the court determined it was ineligible for classification as a medicinal preparation. *Id.*

This distinction was further refined in *Biddle Sawyer Corp. v. United States*, 50 CCPA 85, 320 F.2d 416 (1963). The *Biddle* court determined that in order to be properly classifiable as a medicinal preparation, imported merchandise must possess "curative or alleviative properties in and of itself." *Biddle*, 50 CCPA at 94, 320 F.2d 416. The court concluded that the subject merchandise did not possess therapeutic properties because it did not independently act as a curative. And, because the imported merchandise did not induce a desired physiological effect, the court determined that it was not eligible for classification as a medicinal preparation. It appears that appellant-importer did not argue, and the *Biddle* court did not consider, whether, by imparting properties that enhanced the effectiveness of a medicinal preparation, the subject merchandise exhibited therapeutic properties such that it merited tariff treatment as a drug.

5. The immediate predecessor to Lonza's preferred classification provision, HTS subheading 2941.90.50, is Item 411.76, TSUS (1987), which covered "Drugs: Other: Anti-infective Agents: Antibiotics: Other." Item 411.76, TSUS, was created pursuant to Presidential Proclamation No. 4768 of June 28, 1980. 45 Fed.Reg. 45,135, 45,171 (July 2, 1980). Item 411.76 superseded Item 407.85, TSUS (1963), the originally enacted provision that covered "Drugs: Other."

dicinal properties and chiefly used as medicines or as ingredients in medicines.

This definition remained unchanged throughout the entire controlling period of the TSUS.[6]

In response to a request by the President dated August 24, 1981, the U.S. International Trade Commission ("ITC") initiated an investigation in order to prepare a conversion of the TSUS into the nomenclature of the Harmonized System. The ITC submitted its initial report in June 1983.[7] Annex I to this report contained the proposed Converted U.S. Tariff Schedule. The definition of "drugs" was now placed in Chapter 29, Additional U.S. Legal Note 1(c), which stated:

The term "*drugs*" means compounds having anesthetic, prophylactic, or therapeutic properties and principally used as an active ingredient in a medicament.

Other than changing focus from "substances" to "compounds," and broadening the reference to include anesthetic and prophylactic

compounds, this definition retains the two substantive elements found in the TSUS definition. Significantly, however, the proposed tariff schedule no longer designated "antibiotics" as a subset of the broader heading "drugs." Instead, Chapter 29 introduced the term "antibiotics" as an independent heading within the subchapter covering "Other Organic Compounds."[8]

The Trade Policy Staff Committee of the Office of the U.S. Trade Representative reviewed the ITC's 1983 draft proposal; this review resulted in publication of a second edition proposal in September 1984.[9] Notably, the Chapter 29 Notes in this second edition omitted the revised definition of "drugs" that was contained in the ITC's 1983 draft proposal. The Office of the U.S. Trade Representative published a third edition in October 1986, and a final proposed tariff schedule in July 1987. Neither of these drafts incorporated any definition of the term "drugs."[10]

The HTS, enacted as part of the Omnibus Trade and Competitiveness Act of 1988,[11]

---

6. The TSUS governed U.S. duty rates from August 31, 1963 through December 31, 1988. There were eighteen editions of the TSUS. While the specific numbering of the definition of "drugs" among the headnotes in Schedule 4, Part 1, subpart C, changed over the years, the language employed remained intact. *Compare* Schedule 4, Part 1, subpart C, Headnote 5, TSUS (1963) *with* Schedule 4, Part 1, subpart C, Headnote 9, TSUS (1987).

7. *Conversion of the Tariff Schedules of the United States Annotated into the Nomenclature Structure of the Harmonized System: Report on Investigation No. 332–131 Under Section 332 of the Tariff Act of 1930*, USITC Publication No. 1400 (June 1983) ("*1983 ITC Conversion Report*").

8. The TSUS classified "other antibiotics" under Item 411.76. Annex II to the ITC's 1983 report provided a cross-reference from the then-existing TSUS to the proposed tariff schedule. The table on page 603 of Annex II converted Item 411.76, TSUS, into five provisions in the new tariff schedule; proposed subheading 2941.90.50 is clearly included among these five provisions. Annex III to the ITC's report provided a cross-reference from the proposed tariff schedule to the then-existing TSUS. The table on page 218 of Annex III converted proposed subheading 2941.90.50 into two TSUS provisions, one of which is Item 411.76. The original draft thus evinces an intent that subheading 2941.90.50 continue to embrace "Drugs: Antibiotics: Other."

9. *Conversion of the Tariff Schedules of the United States Into the Nomenclature Structure of the Harmonized System, Revised, Showing Administrative Changes Approved by the Trade Policy Staff Committee*, Trade Policy Staff Committee, Office of the U.S. Trade Representative (September 1984).

10. On October 5, 1987 the ITC instituted investigation No. 332–250; one of the purposes of this study was to prepare a cross-reference between the 1987 TSUS and the final proposed HTS. The ITC's report was published in January 1988. *Continuity of Import and Export Trade Statistics After Implementation of the Harmonized Commodity Description and Coding System: Report to the President on Investigation No. 332–250 Under Section 332 of the Tariff Act of 1930*, USITC Publication No. 2051 (January 1988) ("*1988 Cross–Reference Report*"). The table on page 158 of the report indicates that Item 411.76, TSUS, is converted into subheadings 2941.40.00; 2941.90.10; 2941.90.30; 3003.20.00; 3004.10.50; and 3004.20.00 of the proposed HTS. Subheading 2941.90.50 is clearly absent from this group. It thus appears that the previously evinced intent to retain other antibiotic drugs within the scope of subheading 2941.90.50, HTS, had been abandoned by the time the new tariff schedule was finally enacted. *See supra* note 8.

11. Pub.L. No. 100–418, § 1204, 102 Stat. 1107, 1148 (1988); *see* 19 U.S.C. § 3004 (1988).

took effect on January 1, 1989.[12] In contrast to the TSUS, the HTS did not designate "antibiotics" as a subheading of the broader term "drugs." Rather, the term "antibiotics" was designated an independent heading, i.e. Heading 2941.[13] Significantly, none of the forty-two Headings in Chapter 29 of the first edition of the HTS incorporated the term "drugs;" nor have these Headings since been amended to include the term in subsequent editions of the tariff schedule. Although the term "drugs" was retained, its position had been relegated to isolated subheadings, none of which were included under Heading 2941; in fact, the term "drugs" was incorporated into only sixty-three of the approximately 875 subheadings within the original Chapter 29. And, despite retaining the term, the HTS failed to expressly define "drugs" as it was used in the new tariff schedule.

### B. The Austin Decision

The seminal case construing the term "drugs" under the TSUS is *Austin Chemical Co. v. United States*, 11 CIT 130, 659 F.Supp. 229, *aff'd*, 6 Fed.Cir. (T) 42, 835 F.2d 1423 (1987). The imported merchandise in *Austin*, consisting of D(−) mandelic acid, was classified by Customs under Item 404.46, TSUS.[14] Plaintiff contended that the merchandise was properly classifiable as a drug under Item 411.91, TSUS.[15] After importation the D(−) mandelic acid was sold to Eli Lilly and Company for use in the synthesis of Cefamandole Nafate, a cephalosporin antibiotic which also contains the four-membered beta-lactam ring. D(−) mandelic acid is a chemical intermediate which, after synthesis, imparts the mandelic acid moiety to Cefamandole Nafate. Unlike the ADC–6 moiety present in Imipenem, the mandelic acid moiety does not form the beta-lactam ring present in Cefamandole Nafate; rather, the mandelic acid moiety appears as a functional side-chain on the four-membered beta-lactam ring. The mandelic acid moiety protects the beta-lactam ring from hydrolysis of the amide bond by beta-lactameses produced by the target bacteria. Absent the mandelic acid moiety, Cefamandole Nafate would be susceptible to cleavage by beta-lactameses, resulting in the effective loss of its antibacterial properties.

Concededly, the mandelic acid could not be used alone as a curative. The trial court distinguished, however, between substances that are therapeutic and those that possess therapeutic *properties*. Because the imported D(−) mandelic acid imparted desirable properties to Cefamandole Nafate which enhanced the effectiveness of the antibiotic, the subject merchandise was found to possess therapeutic properties.[16] The trial court further relied upon dictionary definitions of the terms "ingredient" and "constituent" to conclude that Congress intended to recognize

12. Pub.L. No. 100–418, § 1217, 102 Stat. 1107, 1163 (1988); *see* 19 U.S.C. § 3001 (1988).

13. Heading 2941, located in subchapter 13, is entitled "Antibiotics." The term "drugs" is noticeably absent as a descriptor of antibiotics, even among the designated subheadings of Heading 2941.

14. Item 404.46, TSUS, describes "Cyclic organic chemical products ...: Other: Carboxylic acids ...: Other."

15. Item 411.91, TSUS, describes "Products suitable for medicinal use, and drugs: ... Drugs: Other: Anti-infective agents: Mandelic Acid."

16. The trial court stated that:

> The criterion for a drug is not that it be therapeutic but that it possess therapeutic properties. The ability of the mandelic acid to prevent the breakdown of the beta-lactams cannot be denied. When a substance which possesses such desirable properties, although incapable of use alone, is combined with other substances to produce the physiological action to correct the deficient condition, it may properly be classified as a drug.... Therefore, it appears that this characteristic which relates to the treatment of disease by a remedial agent or method is thus, a "therapeutic property".
>
> In comparison, ... for purposes of the term "medicinal preparation", the substance itself must possess the therapeutic or curative property.
>
> . . . . .
>
> Thus, even though according to [defendant's expert] the D(−) mandelic acid in and of itself may not be therapeutic, it is sufficient that it is crucial to the ultimate formation of the antibiotic so that it may be deemed to possess therapeutic properties.

"that before the chemical reaction [producing Cefamandole Nafate] occurs, the component substances of the compound are properly deemed ingredients." *Austin,* 11 CIT at 135, 659 F.Supp. at 233. Consequently, the court deemed D(−) mandelic acid to be an ingredient possessing therapeutic properties which was properly classifiable as a drug under the TSUS.[17] On appeal, the Court of Appeals for the Federal Circuit affirmed the trial court's decision. In doing so, the court held that the trial court did not err when it determined that " 'therapeutic' properties include the imparting of 'properties to the other substances which are necessary to produce an effective antibiotic.' " *Austin,* 6 Fed.Cir. (T) at 45, 835 F.2d at 1426.

## C. *TSUS Classification of ADC–6*

ADC–6 was the subject of protest no. 1001–8–007318, filed on behalf of Merck as protesting party. Customs had classified imported ADC–6 under Item 425.52, TSUS, as Nitrogenous compounds: Other: Other. Upon denial of its protest, Merck commenced an action before this court. Apparently in light of the holding in *Austin,* the parties entered into a Stipulated Judgment on Agreed Statement of Facts. *Merck & Co. v. United States,* Court No. 89–06–00329 (Jan. 8, 1991). In that Stipulated Judgment, the government agreed that ADC–6 was properly dutiable as "other antibiotics obtained, derived, or manufactured in whole or in part from modified benzenoids under Item 411.76, TSUS, at the rate of 6.6% *ad valorem.*" *Id.* In the TSUS, antibiotics are located under the broader descriptor "drugs." The government thus conceded that, under the TSUS, ADC–6 was properly classifiable as a drug, and, more specifically, an antibiotic.

*Austin,* 11 CIT at 133–34, 659 F.Supp. at 231–32 (footnote omitted) (citations omitted).

**17.** The government also argued that the D(−) isomer of mandelic acid was not *eo nomine* "mandelic acid" under Item 411.91, TSUS. Because the subject merchandise satisfied the superior heading of "drugs" in that it possessed therapeutic properties and was used as an ingredient in medicine (the only qualifiers to the *eo nomine* provision "mandelic acid"), and because the TSUS did not contain separate provisions for the

## D. *Analysis*

Lonza argues that because there has been no material change in the language of the HTS provision for antibiotics from that found in the TSUS, and because the structure of the HTS allegedly retains a distinction between "drugs" and "medicaments" for tariff purposes, the *Austin* rationale and the *Merck* Stipulated Judgment compel a finding that ADC–6 is classifiable as an antibiotic under Chapter 29 of the HTS. Lonza asserts that, despite its removal from the controlling tariff schedule, the TSUS definition of "drugs" constitutes the common and commercial meaning of the term, and thus governs classification of antibiotic "drugs" under the HTS. The government argues that "[n]owhere in the applicable HTS section notes, the chapter notes, or in the Explanatory Notes [18] is there any indication, at all, that chemical intermediates used in the manufacture of a finished organic chemical product are classifiable under the heading for that finished product absent independent satisfaction of the relevant criteria for such classification." *Defendant's Pretrial Memorandum* at 10. Because ADC–6 does not satisfy the criteria for classification as an antibiotic under the HTS, the government urges the court to affirm Customs' classification decision. The court will first examine whether ADC–6 meets the TSUS definition of "drugs."

### 1. *ADC–6 satisfies the definition of "drugs" found in the TSUS.*

Based upon the evidence presented at trial, and prior caselaw, the court agrees with Lonza that ADC–6 is a substance that possesses therapeutic properties and is chiefly used as an ingredient in medicine. First, with respect to whether ADC–6 possesses

various isomers of mandelic acid, the court held the D(−) isomer properly classifiable under Item 411.91. *Austin,* 11 CIT at 136, 659 F.Supp. 229.

**18.** Customs Co–Operation Council, *Harmonized Commodity Description and Coding System: Explanatory Notes* (1986) (*"Explanatory Notes"*). The Customs Co–Operation Council was established by a Convention signed in Brussels on December 15, 1950. The *Explanatory Notes* constitute the Council's official interpretation of the Harmonized Tariff System.

therapeutic properties, it is undisputed that ADC–6 contributes all of the atoms in Imipenem's beta-lactam ring; as Lonza's expert witness, Dr. Thomas N. Salzmann, testified, the beta-lactam ring is the antibiotic's killing site, without which the substance is useless as an antibacterial agent. In addition, ADC–6 contributes the entire hydroxyethyl sidechain, without which Imipenem is both defenseless and unable to identify target bacteria. Clearly, absent the ADC–6 moiety, Imipenem is bereft of therapeutic (i.e. antibacterial) value. Just as D(−) mandelic acid was held to possess therapeutic properties because it "impart[s] properties to . . . other substances which are necessary to produce an effective antibiotic," ADC–6 merits a similar evaluation. Indeed, whereas D(−) mandelic acid contributes only a defense element, ADC–6 imparts a killing element, a recognition element, and a defense element to the final antibiotic product. The significance of these contributions can hardly be ignored.

The government urges, however, that in order to be considered therapeutic, a substance must itself be curative. It is conceded that ADC–6 neither kills nor inhibits the growth of microorganisms. Nonetheless, ADC–6 is properly characterized as having therapeutic properties because the elements it imparts are crucial to the ultimate formation of an effective antibiotic. This is the standard sanctioned by our appellate court,[19] and this standard is met in the present case. The government simply fails to recognize

*Austin*'s distinction between therapeutic *uses* and therapeutic *properties*.[20] The court concludes that although ADC–6 itself may not be used as an antibacterial agent, the curative qualities it imparts to Imipenem are of such import that ADC–6 is properly regarded as exhibiting therapeutic properties.

Secondly, the court concludes that ADC–6 is properly considered an ingredient used in the production of Imipenem. At trial, the government's expert witness, Ms. Patricia Gafney, characterized ADC–6 as a mere "stepping stone" between the parent substance and the final product, i.e. a chemical intermediate whose identity is lost during the process of synthesizing Imipenem. Ms. Gafney also testified that the term "ingredient" is not synonymous with the term "chemical intermediate" in the field of chemistry. And finally, the government referred the court to the *Physician's Desk Reference* (46th ed. 1992), which lists the ingredients in PRIMAXIN® as: (1) a sterile formulation of Imipenem; (2) sodium cilastatin; and (3) sodium bicarbonate. ADC–6 is noticeably absent from this list.

Dr. Salzmann testified, however, that characterizing a substance as an ingredient is a functional judgment that · is facilitated by identifying the atoms contributed by a substance to the final compound. In addition to this functional analysis, it has long been recognized that when ascertaining the meaning of a tariff term, the court may consult extrinsic sources.[21] *See, e.g., Productol Chemical*

---

**19.** *Austin*, 6 Fed.Cir. (T) at 45–46, 835 F.2d at 1426, aff'g *Austin Chemical Co. v. United States*, 11 CIT 130, 659 F.Supp. 229 (1987).

**20.** *Austin*, 11 CIT at 132–33, 659 F.Supp. at 231–32. The *Austin* court first noted that "therapeutic" is defined to mean "of or relating to the treatment of disease or disorders by remedial agents or methods; CURATIVE, MEDICINAL." *Id.* at 133, 659 F.Supp. at 231 (citing *Webster's Third New International Dictionary* (1966)). The court also noted that "[p]roperties are the characteristics of a substance and chemical properties are the chemical reactions of a substance." *Id.* at 133 n. 1, 659 F.Supp. at 232 n. 1 (citing *Hackh's Chemical Dictionary* (4th ed. 1969)). Thus, the curative characteristics contributed by a substance via chemical reaction may be deemed "therapeutic properties." In contrast, the term "therapeutic use" indicates that a substance, by itself, is in a condition ready for use as

a curative. *See Austin*, 11 CIT at 133, 659 F.Supp. at 231–32.

**21.** For example, to support its conclusion that D(−) mandelic acid is an ingredient in Cefamandole Nafate, the *Austin* court cited the following definitions of the term "ingredient":

*Webster's Third New International Dictionary*, (1966) . . . :
2. That which enters into a compound, or is a component part of any combination or mixture: CONSTITUENT.
*Hackh's Chemical Dictionary*, (4th Ed.1969) . . . :
ingredient. Any constituent of a mixture. Cf. constituent.
constituent. (1) An element or part of a compound. Cf. *component* of a mixture. (2) An element or compound formed from the components, . . . of a system.

Co. v. United States, 74 Cust.Ct. 138, 142, C.D. 4598 (1975). The court notes that *The Oxford English Dictionary* (2d ed. 1989) defines "ingredient" as:

> 3.a. Something that enters into the formation of a compound or mixture; a component part, constituent, element. Primarily used of medical compositions and other artificial material mixtures, but also of natural compounds and of things immaterial, actions, conditions, etc.

The court is persuaded that the government adopts too narrow a view. As a substance that enters into the formation of a medical compound, ADC–6 satisfies this dictionary definition. Furthermore, under Dr. Salzmann's functional analysis, the court notes that the *sole* purpose of ADC–6 is to contribute to the formation of Imipenem. And finally, the exhibits introduced at trial clearly indicate that the ADC–6 moiety remains cognizable as a portion of the final synthesized compound. Just as D(−) mandelic acid was determined to be an ingredient used in the production of Cefamandole Nafate, so too is ADC–6 accurately described as an ingredient used in the production of Imipenem.

*2. The TSUS definition of "drugs" constitutes the common and commercial meaning of the term under the HTS.*

Although the court finds that ADC–6 meets the definition of "drugs" found in the TSUS, this conclusion is not dispositive. The second issue to be addressed is whether the TSUS definition of "drugs" continues to apply under the HTS. Lonza argues that notwithstanding the fact that the HTS fails to include an express definition of the term, the TSUS definition of "drugs" continues to govern tariff classification because it reflects the common and commercial meaning of the term, and that meaning has not changed since the HTS was enacted.

Unless a contrary legislative intent is shown, tariff terms are construed in accordance with their common and commercial

*Austin,* 11 CIT at 135, 659 F.Supp. at 233. ADC–6 may similarly be considered an ingredient in Imipenem, when measured against these definitions.

meanings, which are presumed to be the same. *See, e.g., Nippon Kogaku (USA), Inc. v. United States,* 69 CCPA 89, 92, 673 F.2d 380, 382 (1982); *Schott Optical Glass, Inc. v. United States,* 67 CCPA 32, 34, 612 F.2d 1283, 1285 (1979). The common meaning of a tariff term presents a question of law to be decided by the court. *American Express Co. v. United States,* 39 CCPA 8, 10, C.A.D. 456, 1951 WL 5377 (1951). In cases where a term is defined by statute, the court need not undertake a common-meaning inquiry, for the statutory definition is controlling. *Overton & Co. v. United States,* 85 Cust.Ct. 76, 80–81, C.D. 4875 (1980). Absent an express definition, however, the court may consult dictionaries, lexicons, scientific authorities, and other such reliable sources in its effort to determine common meaning. *C.J. Tower & Sons of Buffalo, Inc. v. United States,* 69 CCPA 128, 133–34, 673 F.2d 1268, 1271 (1982).

As noted, the TSUS definition of "drugs" was drafted "in light of prevailing customs practice as well as usage in the industry."[22] Congress' definition was thus intended to coincide with the common and commercial meaning of the term. This definition remained intact as an express provision in each of the eighteen editions of the TSUS, which spanned over twenty-five years. Although it appears that the TSUS definition of "drugs" was deliberately abandoned (in light of the fact that an earlier draft of the HTS contained an amended definition of the term), the HTS failed to provide any alternative definition despite retaining the term "drugs" in various subheadings within Chapter 29. The common meaning of a tariff term, once established, remains controlling until a subsequent change in statute compels a revised construction of the term's meaning. *United States v. Great Pacific Co.,* 23 CCPA 319, 324, T.D. 48192, 1936 WL 2997 (1936); *see Sears, Roebuck & Co. v. United States,* 46 CCPA 79, 83, C.A.D. 701, 1959 WL 7589 (1959). The mere retraction of an express definition from the controlling tariff schedule, in and of itself, does not compel a revised

**22.** *Tariff Classification Study,* Schedule 4, Part 1, at 21.

construction. Absent clear evidence of legislative intent to embrace an alternative statutory definition, and in light of its historical pedigree, the court cannot help but conclude that the TSUS definition of "drugs" survives as the common and commercial meaning of the term under the HTS.[23]

### 3. The TSUS definition of "drugs" does not govern the classification of antibiotics under the HTS.

Having determined that the TSUS definition of "drugs" survives as the common meaning of the term under the new tariff schedule, the court must address whether this definition impacts the classification of antibiotics under the HTS. The court concludes that it does not. There are four elements to the court's analysis.

*First,* as the government noted at trial, Congress effected an express change in the tariff description of antibiotics when it implemented the HTS; antibiotics are no longer classified as a subset of the broader heading "drugs," as they were under the TSUS. Instead, the term "antibiotics" has been elevated as the *sole* descriptor of Heading 2941. Subchapter 13, Chapter 29, HTS, unambiguously indicates that the only prerequisite to classification under Heading 2941 is satisfaction of the criteria embraced by the term "antibiotics."

Lonza responds to the government's observation with two points. First, Lonza offers the court a side-by-side comparison of Items 411.60 through 411.76, TSUS, and Heading 2941, HTS, in support of its argument that

no material change was intended in the tariff treatment of antibiotics under the HTS. This comparison is deficient in one major respect; namely, it fails to acknowledge the deliberate omission of the term "drugs" as a general descriptor of antibiotics under the HTS. It is immaterial that specific provisions for antibiotics remained unchanged in the new tariff schedule. What is significant is that under the HTS, antibiotics constitute an independent Heading within Chapter 29; this is a marked departure from the TSUS framework, which placed antibiotics within the broader descriptor "drugs." Secondly, Lonza notes that in converting the TSUS into the Harmonized System, the ITC was directed to avoid changes in rates of duty wherever possible;[24] and, if the TSUS definition of "drugs" does not apply to Heading 2941, the duty assessed upon imports of ADC–6 will be increased. This drafting guideline, however, simply cannot overcome the actual framework adopted, and the specific language chosen, by Congress when it enacted the HTS.[25] The term "drugs" is expressly limited to sixty-three subheadings in Chapter 29, in utter contrast to its scope under the TSUS. Furthermore, the term is employed nowhere among the eleven subheadings within Heading 2941.[26] The implication is clear. The classification of imports as antibiotics is confined solely to those substances that independently satisfy the criteria for an antibiotic; the term "drugs" is no longer relevant to this classification decision under the HTS.

*Second,* the court rejects Lonza's assertion that antibiotics should be treated as drugs simply by virtue of their location in Chapter

23. The court's conclusion is further supported by reference to *The Oxford English Dictionary* (2d ed. 1989), which defines the term "drug" as:
    1.a. An original, simple, medicinal substance, organic or inorganic, whether used by itself in its natural condition or prepared by art, or as an ingredient in a medicine or medicament. Formerly used more widely to include all ingredients used in chemistry, pharmacy, dyeing, and the arts generally....
This definition accords with that found in the TSUS; thus, it is evident that the TSUS definition continues to reflect the common meaning of the term.

24. *1983 ITC Conversion Report,* at 30.

25. This case does not present the first instance in which a classification concept under the TSUS has been altered. *See, e.g.,* Ruth F. Sturm, *Customs Law & Administration* § 50.4 at 21 (1993) (comparing use of the term "of" under the TSUS and "wholly of" under the HTS).

26. Heading 2941 may be contrasted with Heading 2933, HTS, in this regard. Subheading 2933.59 embraces an additional *eight* subheadings that are introduced by the broader descriptor "drugs." Similarly, subheading 2933.90 embraces eleven additional subheadings that are introduced by the term "drugs."

29. Lonza argues that the HTS incorporates a distinction between drugs and medicaments by classifying the former solely within Chapter 29, while the latter are classified solely within Chapter 30. Lonza bases its position on the fact that "[t]he term 'drugs' appears throughout Chapter 29," while "[t]he term 'medicaments' as well as specific types of medicaments are employed throughout Chapter 30." *Pretrial Memorandum of Plaintiff* at 16 n. 4, 18. As the court noted, however, Congress made limited use of the term "drugs" in Chapter 29; had Congress intended that all organic chemicals provided for in Chapter 29 of the HTS be treated as drugs, it would have utilized the term more broadly, just as it did in the TSUS. Furthermore, Lonza's argument is undermined by reference to subheadings 2918.21.10 and 2918.23.10, HTS. Subheading 2918.21.10 describes "Salicylic acid and its salts: Suitable for medicinal use." Subheading 2918.23.10 describes "Salol (Phenyl salicylate) suitable for medicinal use." If the distinction between drugs and medicaments under the HTS were as absolute as Lonza asserts, these substances should have been provided for under Chapter 30. Instead, they are included in Chapter 29. The historical distinction between drugs and medicaments thus appears irrelevant to the classification of organic chemicals under the HTS.

*Third,* Lonza asserts that antibiotics are commonly understood to be drugs, and that therefore Heading 2941, HTS, incorporates the TSUS definition of "drugs." The court first notes that *The Oxford English Dictionary* (2d ed. 1989) defines the term "antibiotic" as:

2. Injurious to or destructive of living matter, esp. micro-organisms.

3. [A]n antibiotic substance: one of a class of substances produced by living organisms and capable of destroying or inhibiting the growth of micro-organisms; *spec.* any of these substances used for *therapeutic* purposes. Also used of synthetic organic compounds having similar properties.

In addition, *Van Nostrand's Scientific Encyclopedia* (7th ed. 1989) defines the term "antibiotic" as:

A biochemical drug, derived from one or more kinds of microorganisms, which has the ability to (1) inhibit the growth (*bacteriostatic agent*), or (2) to kill (*bactericidal agent*) a number of other microorganisms and thus of immense value in treating a number of diseases that result from microbial infection.

The court also notes that each party's expert witness testified that the commonly accepted meaning of the term "antibiotic" includes the ability of a substance to kill or inhibit the growth of bacteria. Indeed, Lonza's expert witness, Dr. Salzmann, testified that ADC–6 would not commonly be considered an antibiotic precisely because it lacks the ability to kill bacteria or to inhibit bacterial growth. Nevertheless, Dr. Salzmann also testified that he believed ADC–6 was properly classified as an "antibiotic," as that term is used in the tariff schedules. Dr. Salzmann thus seems to envision a distinction between the meaning of "antibiotic" as it is used in the HTS, and the commonly accepted meaning of the term. This position is unfounded.

The testimony of both expert witnesses indicates a common understanding of the term "antibiotic" that is consistent with dictionary definitions previously cited. The court recognizes that *Van Nostrand's* refers to an antibiotic as a biochemical drug. Still, the defining characteristic of antibiotic substances common to all definitions is the ability to kill or inhibit the growth of microorganisms. The term "drug" adds nothing to an understanding of what is meant by "antibiotic." Segregation of these terms is further supported by the expert testimony of Ms. Gafney, who proffered thienamycin as an example of a substance that is not considered a drug, and yet is still classifiable under Heading 2941 as an antibiotic. Although thienamycin, by itself, exhibits antibacterial properties, it is not considered a drug because it is not used as a medicine or as an ingredient in a medicine.

Consequently, upon consideration of all of the evidence presented, the court finds that antibiotics are commonly understood to mean

substances, produced either naturally or synthetically, that exhibit an ability to kill or inhibit the growth of microorganisms. And, as noted, tariff terms are generally construed in accordance with their common meaning. In this case there is no evidence that Congress intended to apply any meaning other than the common meaning of "antibiotics," nor does there appear to be a conflicting commercial designation of the term. As a result, the court finds that the common meaning of the term "drugs" is not incorporated into the common meaning of the term "antibiotics." Chemical intermediates devoid of the ability to kill or inhibit the growth of bacteria simply do not merit classification as an antibiotic under Heading 2941, HTS.[27]

*Fourth,* the HTS *Explanatory Notes* support the court's conclusion in this case. While the *Explanatory Notes* do not constitute controlling legislative history, they do offer guidance in interpreting HTS subheadings.[28] *Pfaff American Sales Corp. v. United States,* 17 CIT ——, Slip Op. 93–101, 1993 WL 209619 (CIT June 9, 1993). *Explanatory Note* 29.41 offers a narrow definition of the term "antibiotics." The government relies upon this definition and others like it to argue that classification under Heading 2941 is restricted to antibiotics that are produced naturally. The government fails to acknowledge, however, that by including "certain synthetic products closely related to natural antibiotics and used as such," *Note* 29.41 includes substances of purely synthetic origin. While a determination of what is meant by "closely related" is beyond the scope of this opinion, when viewed in its entirety *Explanatory Note* 29.41 does not appear to conflict with the court's determination of what constitutes the common meaning of the term "antibiotics."[29]

*Explanatory Note* 29.41 includes examples of substances that merit classification as an antibiotic, as well as substances that are not covered by Heading 2941. Because *Explanatory Note* 29.41(b) provides that chemical intermediates used in the manufacture of antibiotics and possessing a very low antibiotic activity are precluded from classification

**27.** Dr. Salzmann also testified that in the eyes of the scientific community, the term "chemical intermediate" is not synonymous with the term "antibiotic." It is undisputed that ADC–6 is an intermediate used in the synthesis of Imipenem.

**28.** The *Explanatory Notes* to Chapter 29, subchapter XIII, Heading 2941, HTS, state in pertinent part:

Antibiotics are substances secreted by living micro-organisms which have the effect of killing other micro-organisms or inhibiting their growth....

.        .        .        .        .

Antibiotics may consist of a single substance or a group of related substances, their chemical structure may or may not be known or chemically defined. They are chemically diverse and include the following:
(1) Heterocyclic, e.g., novobiocin, cephalosporins, streptothricin. The most important of this class are the penicillins which are secreted by several species of the fungus *Penicillium.* This class also includes procaine penicillin.

.        .        .        .        .

(7) Other antibiotics, e.g., sarkomycin, vancomycin.
This heading also includes chemically modified antibiotics used as such. These may be prepared by isolating ingredients produced by natural growth of the micro-organism and then modifying the structure by chemical reaction or by adding sidechain precursors to the growth-medium so that desired groups are incorporated into the molecule by the cell-processes (semi-synthetic penicillins); or by biosynthesis (e.g., penicillins from selected aminoacids).
Natural antibiotics reproduced by synthesis (e.g., chloramphenicol) are classified in this heading, as are certain synthetic products closely related to natural antibiotics and used as such (e.g., thiamphenicol).
This heading does not cover:

.        .        .        .        .

(b) Chemically defined organic compounds with a very low antibiotic activity, used as intermediates in the manufacture of antibiotics (earlier headings of this Chapter according to structure).
1  *Explanatory Notes* at 423.

**29.** To the extent the definition of "antibiotics" found in the *Explanatory Notes* conflicts with the court's determination, that definition is rejected. The expert testimony presented at trial indicates that synthetic and synthetically-modified antibiotics are of recent discovery. Thus, it is not unlikely that dated sources define antibiotics only as naturally-produced substances. As Dr. Salzmann testified, however, the origin of an antibiotic substance has no bearing on its antibiotic activity.

under Heading 2941, the government argues that ADC–6, a chemical intermediate devoid of the ability to kill or inhibit the growth of bacteria, is similarly precluded from such classification. Lonza responds by urging that while "the term 'antibiotic activity' [generally] refers to a substance's ability to kill or inhibit the growth of microorganisms, ... this construction[,] in the context of [*Explanatory Note* 29.41,] would render the referenced *Explanatory Note* meaningless." *Pretrial Memorandum of Plaintiff* at 32. Specifically, Lonza argues that this reading of *Explanatory Note* 29.41 cannot be sustained because "there exist *no* specifically defined chemical compounds currently used as intermediates in the manufacture of antibiotics which have the ability to kill or inhibit the growth of bacteria." *Id.* at 32–33. Instead, Lonza asserts that "the phrase 'antibiotic activity' must refer to the antibiotic or therapeutic *properties* of compounds used as intermediates in the manufacture of antibiotics." *Id.* at 33.

The court finds Lonza's argument thoroughly unpersuasive. The fact that there are no chemical compounds currently used as intermediates in the manufacture of antibiotics, and which possess an ability to kill or inhibit bacterial growth, does not render *Explanatory Note* 29.41 meaningless; it is entirely possible that such substances exist, but merely await discovery. The authors of the *Explanatory Notes* cannot be faulted for anticipating future developments in the field of biochemistry when they drafted *Note* 29.41.

Moreover, the absence of any antibiotic activity completely satisfies the criterion of "very low antibiotic activity." In the context of the present case, this plain reading of the criteria discussed in *Note* 29.41 affords the *Note's* proscription immediate effect. *Explanatory Note* 29.41 provides that substances exhibiting "very low antibiotic activity" are properly classified within earlier Headings of Chapter 29, according to structure. The court finds that ADC–6 does not exhibit any "antibiotic activity" because it lacks the ability to kill or inhibit the growth of bacteria. This accords with the court's determination of the common meaning of the

term "antibiotic." Because the court finds that "very low antibiotic activity" embraces "no antibiotic activity," the *Explanatory Notes* indicate that ADC–6 is properly classified earlier within Chapter 29, according to its chemical structure. This is precisely what Customs did when it classified ADC–6 under Heading 2922 as other oxygen-function amino-compounds. Based upon the foregoing analysis, the court finds that Customs' classification of the subject merchandise was correct.

### CONCLUSION

Although the TSUS definition of "drugs" continues to represent the common and commercial meaning of the term under the HTS, where that term is employed, the relevant statutory framework has changed such that chemical intermediates used in the production of an antibiotic are not classifiable as an antibiotic, absent independent satisfaction of the criteria for such classification. The term "antibiotic" is commonly understood to mean the ability to kill or inhibit the growth of microorganisms. Because ADC–6 lacks the ability to kill bacteria or to inhibit bacterial growth, it is ineligible for classification as an antibiotic under the HTS. Customs' classification is affirmed; judgment will be entered accordingly.

/s/ Richard W. Goldberg
Richard W. Goldberg
JUDGE

Dated:   March 25, 1994

New York, New York.